146 P.3d 697

STATE of Idaho, Plaintiff–Respondent,

v.

Eloy ZUNIGA, Defendant–Appellant.

No. 30728.

Court of Appeals of Idaho.

Oct. 17, 2006.

Molly J. Huskey, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Ralph R. Blount, Deputy Attorney General, Boise, for respondent.

WALTERS, Judge Pro Tem.

Eloy Zuniga was found guilty in a jury trial for possession of a controlled substance, methamphetamine. I.C. § 37–2732(c). He appeals from the judgment of conviction entered by the district court, asserting that the district court erred by denying his motion to suppress evidence. We affirm.

## I.

### FACTS AND PROCEDURE

The following facts are drawn from the evidence presented on Zuniga's motion to suppress. Detective Nick Lathrop of the Nampa City Police Department accompanied an employee of the Idaho Department of Health and Welfare for a home visit in Nampa on a child protective case. Their purpose was to investigate the conditions under which children were living in the house. Officer Lathrop's presence was a normal activity of the police department in such cases. The

home they were to visit had a known history of drug activity in it. When they arrived at the house they saw two men outside of the home talking to an Idaho Power Company employee. As Detective Lathrop approached the house, the two men entered the home. Lathrop talked with the Power Company employee who said he was there to turn off the power. One of the two men who had entered the house then came out, carrying a duffel bag. Lathrop, who was in plain clothes but with his badge on his belt, identified himself as a police officer to the man with the duffel bag. Lathrop questioned the man about who else was in the house and what his relation was to the house. He also asked what the fellow's name was, and for his birth date. The man responded that he did not know if anyone was in the house. According to Lathrop, the man became evasive and very uneasy about Lathrop's presence. The man said his name was "Robert Bravo" and gave Lathrop a birth date. Lathrop ran this information through dispatch and was informed that it had no record for such a person. At that point, Lathrop became suspicious that the man had given him a false name. Lathrop told the man to sit on a bench at a picnic table in the front yard while Lathrop went to the house to contact someone who might know who the man was. The man went to the bench and sat down as directed by Lathrop. Lathrop later testified that when he told the man to sit down, the man was not free to leave although at that time, he was not under suspicion of having committed any crime.

Lathrop went to the door of the house and spoke to a male person whom Lathrop knew lived at the house. While Lathrop was engaged in this conversation, the individual seated at the table jumped up and ran from the yard. Lathrop took chase.

They ran through the neighborhood for about four blocks. At one point going through a mobile home park, Lathrop observed the other man duck down behind a car, pull out a cigarette package from his clothing, remove a clear plastic baggie and throw it on the ground. Lathrop was within five or six feet from the man so he unholstered his pistol and told the man to stop.

However, the man kept running, so Lathrop reholstered his gun and continued on. He caught up with the man and tackled him. Underneath the man was the cigarette pack. It contained two more baggies of substances. After Lathrop retrieved all of the baggies, he field tested them and determined they contained methamphetamine. Lathrop found from identification in the man's wallet that his name was Eloy Zuniga. Zuniga was arrested for possession of a controlled substance and for obstructing an officer. In addition, Lathrop was advised by dispatch that there were warrants outstanding for Zuniga's arrest.

Zuniga filed a motion to suppress evidence. He contended that he had been illegally seized by Detective Lathrop due to a lack of reasonable suspicion for a detention and that the evidence obtained by Lathrop during the chase was tainted as fruit of the poisonous tree under *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455–56 (1963).

After an evidentiary hearing on the motion to suppress, the district court held that the evidence showed that Lathrop had seized Zuniga when he ordered Zuniga to sit at the picnic table while Lathrop conducted further investigation. The district court also found that the state failed to show that there was a reasonable suspicion articulated by Lathrop to justify the detention. However, the district court determined that the unlawful seizure ended when Zuniga fled. The court then concluded that under *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the evidence dropped by Zuniga while being chased by Detective Lathrop was lawfully seized by the police and would not be suppressed.

Zuniga was found guilty of possession of a controlled substance after a jury trial. He then brought this appeal, challenging the denial of his motion to suppress.

## II.

### STANDARD OF REVIEW

The review of a motion to suppress involves a mixed question of law and fact. *State v. Zubizareta,* 122 Idaho 823, 826, 839

P.2d 1237, 1240 (Ct.App.1992); *State v. McAfee*, 116 Idaho 1007, 1008, 783 P.2d 874, 875 (Ct.App.1989). On appeal, we defer to the findings of the district court unless they are clearly erroneous. *State v. DuValt*, 131 Idaho 550, 552–53, 961 P.2d 641, 643–44 (1998); *Zubizareta*, 122 Idaho at 826, 839 P.2d at 1240. However, we exercise free review over whether constitutional requirements have been satisfied in light of the facts found. *Id.*

## III.

## DISCUSSION

■ The right to be free from unreasonable searches and seizures is protected by the Fourth Amendment of the United States Constitution and Article 1 Section 17 of the Idaho Constitution. The constitutional protections against unreasonable seizures include seizures of the person. *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 169–70, 4 L.Ed.2d 134, 137 (1959). Furthermore, it is well established that if evidence is directly or indirectly obtained through the government's exploitation of unconstitutional methods, that evidence must be excluded as "fruit of the poisonous tree." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455–56.

■ We begin with Detective Lathrop's initial contact with Zuniga. Not every encounter between a law enforcement officer and a citizen triggers Fourth Amendment scrutiny. *State v. Reese*, 132 Idaho 652, 653, 978 P.2d 212, 213 (1999). An encounter becomes a seizure, for Fourth Amendment purposes, when an officer, by means of physical force or by show of authority, has in some way restrained the liberty of a citizen. *Hodari D.*, 499 U.S. at 625, 111 S.Ct. at 1550, 113 L.Ed.2d at 696–97; *United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497, 508–09 (1980). Whenever an officer detains a person, however briefly, a seizure has taken place. *State v. Wixom*, 130 Idaho 752, 754, 947 P.2d 1000, 1002 (1997), *citing Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906–07 (1968). The test for deciding whether someone has been seized by a show of authority is an objective one. *Mendenhall*. 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. A person is deemed "seized within the meaning of the Fourth Amendment *only if*, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509 (opinion of Stewart, J.); see also *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (acknowledging that the Supreme Court has embraced the test set forth by Justice Stewart). Thus, an officer's verbal request or command can amount to a seizure of a person if, in view of all of the circumstances surrounding the incident, the command would cause a reasonable person to believe that he was not free to leave and the person accedes to the command. *Mendenhall*, at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. *See also, State v. Harwood*, 133 Idaho 50, 53, 981 P.2d 1160, 1163 (Ct.App.1999); *State v. Agundis*, 127 Idaho 587, 590–93, 903 P.2d 752, 755–58 (Ct.App.1995). Here, the evidence showed that Zuniga obeyed the command by Lathrop to sit on the bench at the picnic table. Lathrop himself acknowledged that Zuniga was not free to go while Lathrop conducted a further investigation concerning Zuniga's suspicious identity. The fact that Zuniga was pursued by Lathrop when he did leave shows just how reasonable it was for Zuniga to believe that his freedom was being restricted. It is clear that Zuniga had been seized by Lathrop within the context of constitutional law.

■ The Fourth Amendment generally precludes the detention of an individual by an officer unless the officer has a reasonable, articulable suspicion that the person to be seized had committed or was about to commit a crime. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236–37 (1983); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607, 616–17 (1975); *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906–07 (1968); *State v. Fry*, 122 Idaho 100, 103, 831 P.2d 942, 945 (Ct.App.1991). Whether an officer had reasonable suspicion to detain a citizen is deter-

mined on the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *State v. Johns*, 112 Idaho 873, 877, 736 P.2d 1327, 1331 (1987). "In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362–63 (1979).

In the suppression proceeding, Detective Lathrop candidly admitted that Zuniga was not suspected of being engaged in any criminal activity when they first met. Notwithstanding Officer Lathrop's concession, the state urges that there was reasonable suspicion of criminal activity that would have justified Zuniga's detention by Lathrop and that the district court erred by holding to the contrary. The state submits that the district court's conclusion that the evidence would not be suppressed can be sustained by this Court upon the alternative theory that there was indeed reasonable suspicion articulated by the testimony presented at the suppression hearing. In support of this argument, the state points to Zuniga's nervousness when confronted by Detective Lathrop; Lathrop's knowledge of prior drug activities at the house; the fact there was "a current complaint alleging children were living in unsafe conditions due to dirt and drug activity" at the house; the fact that Zuniga gave a false name to Lathrop; and the fact that Zuniga decided to flee from Lathrop after he was seized.

 We, as was the district court, are not persuaded by the state's argument. While Zuniga may have appeared uneasy upon meeting Detective Lathrop, courts have generally held that nervousness is of limited value in determining reasonable suspicion and must be treated with caution. "Because it is common for people to exhibit signs of nervousness when confronted with law enforcement regardless of criminal activity, a person's nervous demeanor during such an encounter is of limited significance in establishing the presence of reasonable suspicion." *State v. Gibson*, 141 Idaho 277, 285–86, 108

P.3d 424, 432–33 (Ct.App.2005). *See also Brent v. Ashley*, 247 F.3d 1294, 1302 (11th Cir.2001); *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir.1998); and *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994).

 Zuniga's presence at a location where criminal activity had been suspected in the past is also of little significance. A person's mere proximity to people who are suspected of criminal activity, or presence in a location where a search has been authorized by warrant, does not give probable cause to search that person. *Gibson*, 141 Idaho at 283, 108 P.3d at 430 (citing *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). Similarly, mere presence in a high crime area is not enough to support a reasonable, articulable suspicion that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 674, 145 L.Ed.2d 570, 576 (2000). Indeed, the area involved in this case was a residential neighborhood with no indication that it was a "high crime area."

The state's emphasis on Zuniga providing a fictitious name to Detective Lathrop is also without significance. All that Lathrop knew was that he was provided the name "Robert Bravo" together with a birth date, and that dispatch reported it had no record of such a person. He knew only that dispatch found no match in its data base, not that the name was fictitious or that a person with that name and birth date did not exist in fact. The name of a person without a criminal record and without an Idaho driver's license or automobile registration—such as a visitor from out-of-state—likely would not appear in the dispatch's data base. That he later discovered Zuniga's true identity did not validate the initial detention which occurred without the requisite existence of articulable, reasonable suspicion that criminal conduct was afoot.

 Similarly, the state's reliance on Zuniga's flight is completely misplaced. Zuniga fled only after he was detained; it is therefore not relevant to whether Detective Lathrop possessed reasonable, articulable suspicion that criminal activity was afoot at the time that he detained Zuniga. The justification for the detention must exist when the

detention takes place; the only relevant facts are those that are known to the officer when the stop was made.

 In sum, the only facts that detective Lathrop possessed when he detained Zuniga in the front yard of the house was that Zuniga was in a place that drug activity had been suspected at some undisclosed time in the past, that Zuniga appeared uneasy, and that the name Robert Bravo with the birth date provided by Lathrop did not appear in the dispatch records. We agree with the district court that these circumstances, as a whole, were not sufficient to establish reasonable, articulable suspicion that criminal activity involving Zuniga was afoot. The district court correctly held that Zuniga's initial detention by Detective Lathrop was unreasonable under Fourth Amendment protections.

We turn next to the district court's conclusion that the evidence dropped by Zuniga during the chase culminating in his physical capture by Detective Lathrop was properly seized and was not suppressible. The district court relied upon *Hodari D.* to support its conclusion. The district court reached its *Hodari D.* analysis by first concluding that the initial seizure of Zuniga without reasonable suspicion ended when Zuniga jumped up from the picnic table and fled. We agree. *Hodari D.* makes clear that a seizure can occur either by submission to an officer's show of authority, or by the application of physical force. *Hodari D.*, 499 U.S. at 626–28, 111 S.Ct. at 1550–52, 113 L.Ed.2d at 697–99. Here, after first acceding to Lathrop's command, Zuniga withdrew from submission to the officer's order to remain seated at the table. Accordingly, the detention ceased when Zuniga fled.

The facts of *Hodari D.* illustrate how the concept of a seizure should be applied. When two police officers approached a group of young men gathered around a car, the group immediately dispersed, prompting one officer to pursue Hodari. By taking a side street, the officer was able to overtake Hodari. Surprised, Hodari tossed away what appeared to be a small rock, moments before the officer tackled him. The central question before the Supreme Court was whether the small rock, which turned out to be crack cocaine, should be suppressed. The Court held that even assuming that the officers did not have reasonable suspicion to stop Hodari when the pursuit began, the cocaine should not have been suppressed, for Hodari never complied with the police officer's original show of authority and therefore was not seized when he threw the substance aside. The Court said:

> In sum, assuming that [Officer] Pertoso's pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude the evidence of it was properly denied.

*Hodari D.*, 499 U.S. at 629, 111 S.Ct. at 1552, 113 L.Ed.2d at 699.

Here, Zuniga first complied with the officer's command to remain at the table. Had he been searched at that time and the methamphetamine found, it would have been suppressible as fruit of the poisonous tree due to the unlawful detention without reasonable suspicion. But Zuniga decided to forgo the opportunity to challenge his seizure at that stage. Instead, he chose to terminate the seizure through escape from Lathrop's authority. It would be a fiction for us to hold that Zuniga was still under seizure by Lathrop while he was running away and no longer submitting or yielding to Lathrop's authority. *Hodari D.* recognized that, with respect to a show of authority as with respect to application of physical force, a seizure does not occur where the subject refuses to yield to that authority. *Hodari D.*, 499 U.S. at 626, 111 S.Ct. at 1550, 113 L.Ed.2d at 697. Analogizing to an arrest, the Court said:

> To say that an arrest is effected by the slightest application of physical force despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, [Officer] Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that

disclosure had been made during the course of an arrest. Cf. *Thompson v. Whitman,* 18 Wall. 457, 471, 21 L.Ed. 897, 902 (1874) ("A seizure is a single act, and not a continuous fact.").

*Hodari D.,* 499 U.S. at 625, 111 S.Ct. at 1550, 113 L.Ed.2d at 696–97 (emphasis in original).

The use of the exclusionary rule to inhibit production of evidence gathered in police chases was also addressed in *Hodari D.* The Court said:

> Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.

*Hodari D.,* 499 U.S. at 627, 111 S.Ct. at 1551, 113 L.Ed.2d at 698 (emphasis in original).

## IV.

## CONCLUSION

Accordingly, we hold that when Zuniga disobeyed Detective Lathrop's order to remain seated and fled from the scene, he was no longer the subject of an unlawful detention. The chase by Detective Lathrop did not constitute a new seizure under *Hodari D.,* until Zuniga was tackled by Lathrop. The methamphetamine discarded by Zuniga and dropped by him when he was tackled was not the fruit of the poisonous tree. The district court correctly concluded that the evidence should not be suppressed. Accordingly, Zuniga's judgment of conviction is affirmed.

Chief Judge PERRY and Judge LANSING concur.